**IN THE UNITED STATES COURT OF FEDERAL CLAIMS**

**BID PROTEST**

| | | |
|---|---|---|
| **ELECTRA-MED CORPORATION;** | ) | |
| **A2A INTEGRATED LOGISTICS INC.;** | ) | |
| **ZILLION SOLUTIONS, INC.;** | ) | |
| **AND ALLIANT ENTERPRISES, LLC** | ) | |
| | ) | |
| *Plaintiffs*, | ) | |
| | ) | |
| v. | ) | No. 18-927 C |
| | ) | |
| **THE UNITED STATES,** | ) | Redacted Version |
| | ) | |
| *Defendant.* | ) | |

**BID PROTEST COMPLAINT**

Pursuant to 28 U.S.C. § 1491(b), Plaintiffs Electra-Med Corporation; A2A Integrated Logistics Inc.; Zillion Solutions, Inc.; and Alliant Enterprises, LLC, by their undersigned counsel, submit this bid protest Complaint.

**INTRODUCTION**

1.  This protest challenges the Class Justification and Approval for Other Than Full and Open Competition ("J&A") issued by the U.S. Department of Veterans Affairs ("VA" or the "Agency") to justify the modification of VA Contract Nos. VA119-16-D-0002 with Kreisers, Inc. ("Kreisers"), VA119-16-D-0004 with American Medical Depot ("AMD"), VA119-16-D-0005 with Cardinal Health 200, Inc. ("Cardinal"), and VA119-16-D-0006 with Medline Industries, Inc. (collectively, the "Contracts" and the "Prime Vendors"). The contract modifications would expand the scope of the Contracts from just "distribution" of healthcare supplies under the VA's Medical-Surgical Prime Vendor-Next Generation ("MSPV-NG") Program to both "distribution and supply."

2.     The Prime Vendor for each region is VA's mandatory source of supplies on a master list (the "formulary") for that region. The J&A contemplates that the Prime Vendors will expand the formulary by selecting suppliers from their own supply chains.

3.     The proposed modifications would improperly transfer the Government's authority to choose suppliers and price supplies to the Prime Vendors, illegally eliminating competition for supplies, as well as the statutorily-required preference for contracting with veteran-owned small businesses ("VOSBs") and service-disabled veteran-owned small businesses ("SDVOSBs"). Further, some of the Prime Vendors are potential suppliers against whom Plaintiffs will need to compete.

4.     The proposed modifications are contrary to law and otherwise improper for numerous reasons.

- *First*, they would create improper sole-source awards to the Prime Vendors for all supply requirements within each Prime Vendor's designated region, without adequate justification for limiting competition.

- *Second*, the proposed modifications would improperly bundle the VA's requirement for *distribution* of medical and surgical supplies with all of the VA's requirements for *purchase of* the supplies themselves, precluding small businesses from participating as prime contractors selling products to the government.

- *Third*, the VA failed to consider the Prime Vendors' impaired objectivity Organizational Conflicts of Interest and Personal Conflicts of Interest because the Prime Vendors will be in a position to select their own products and those of their favored suppliers.

- *Fourth,* modifying the Contracts would constitute a failure of the VA to comply with its statutory obligations to set aside to contracting with SDVOSBs and VOSBs where at least two such businesses are capable of performing because the VA did not consider whether any such businesses can provide the supplies it proposes to fold into the Prime Vendors' Contracts on a sole-source basis.

- *Fifth*, the proposed modifications would result in an improper outsourcing of inherently governmental procurement functions.

- *Sixth,* the modifications violate the Competition in Contracting Act by abusing the structure of a contract to avoid competition and funnel money to favored contractors.

5.    Each provides an independent and sufficient basis to sustain this protest.

6.    As a result of these and other flaws discussed below, the Plaintiffs seek preliminary and permanent injunctive relief to prevent the VA from modifying the Contracts as contemplated by the J&A (or to reverse any such modification that has already been affected) and respectfully states the following below.

<b><u>PARTIES</u></b>

7.    The Plaintiffs are service-disabled, veteran-owned small businesses and are suppliers of medical and surgical supplies to the VA.  Under the VA's planned modification, Plaintiffs will no longer be able to sell their products directly to the VA.  Instead, the Prime Vendors will select who supplies the VA and will establish the prices.

8.    Defendant is the United States of America acting through the VA, a federal agency.

<b><u>NATURE OF THE ACTION</u></b>

9.    This is an action for declaratory and injunctive relief pursuant to the Tucker Act, 28 U.S.C. § 1491(b)(l) and (b)(2).

10.    This action seeks the review of the VA's issuance of a Class Justification and Approval for Other than Full and Open Competition (the "J&A") and associated modifications to VA Contract Nos. VA119-16-D-0002, VA119-16-D-0004, VA119-16-D-0005, and VA119-16-D-0006.

11.    The VA's actions with respect to this procurement and award are arbitrary and capricious, without a rational basis, and contrary to applicable law.

12.     The VA's improper actions directly harm the Plaintiffs, who are prospective bidders if the VA properly competed the expanded scope of the Contracts among SDVOSBs and VOSBs, and are harmed by the Agency's improper bundling of contract requirements and the Prime Vendors' conflicts of interest in choosing suppliers.

13.     The Plaintiffs seek a declaration that the VA's J&A is unreasonable and improper and a permanent injunction prohibiting its use and the associated contract modifications.

## JURISDICTION

14.     This Court has jurisdiction over bid protest actions pursuant to 28 U.S.C. § 1491(b). The Court evaluates bid protests under the Administrative Procedure Act's ("APA") standard of review for an agency action. *Bannum, Inc. v. United States*, 404 F.3d 1346, 1351 (Fed. Cir. 2005) (citing *Impresa Construzioni Geom. Domenico Garufi v. United States*, 238 F.3d 1324, 1332 (Fed. Cir. 2001)). An agency procurement action may be set aside only if it is "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with the law." 28 U.S.C. § 1491(b)(4); 5 U.S.C. § 706(2)(A).

15.     Standing in bid protests is framed by 28 U.S.C. § 1491(b)(1), which requires the bid protest to be brought by an "interested party."  A protestor is an "interested party" if it is an "(1) actual or prospective bidder and (2) possess[es] the requisite direct economic interest." *Weeks Marine, Inc., v. United States*, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (*citing Rex Serv. Corp. v. United States*, 448 F.3d 1305, 1308 (Fed. Cir. 2006)). In a pre-award protest, a protestor has a direct economic interest in a procurement if it can assert a "non-trivial competitive injury which can be redressed by judicial relief." *Weeks Marine, Inc.*, 575 F.3d at 1361-62. The nature of the protest will dictate the necessary factors for a "direct economic interest." *Sys. Appl. & Techs. v. United States*, 691 F.3d 1374, 1382 (Fed. Cir. 2012).

16.     Plaintiffs are "interested parties."  They are suppliers to the VA who will no longer be able to sell products listed on the formulary directly to the VA and will no longer have the ability to sell to the VA products that are added to the formulary.  The modifications will deny Plaintiffs the right to compete fairly, and their direct economic interest is therefore affected by the modifications of the Contracts.  In addition, Plaintiffs' economic interests are harmed by the VA's improper bundling of the contract requirements, which precludes them from competing for the sale of supplies, and other violations of law set forth in this Complaint.

17.     The Court has jurisdiction to grant the injunctive relief requested under the Tucker Act, as amended, 28 U.S.C. § 1491(b)(2) and RCFC 65.

## BACKGROUND

18.     As the VA noted in its J&A, the VA manages the largest integrated healthcare system in the United States and includes 1,243 healthcare facilities (including 170 medical centers), 1,063 outpatient sites, and 53,000 independent licensed practitioners which provide care for about 9 million veterans.

19.     These facilities and practitioners require a significant variety of expendable medical, surgical, and related supplies.

20.     On February 24, 2016,[1] the VA, through its Office of Procurement, Acquisition and Logistics ("OPAL") awarded four contracts to distributors that would distribute expendable supplies purchased by the VA from suppliers to VA medical facilities. At the time of the award of these distribution contracts, the VA presumably believed it had an adequate supply program.  The four sole-sourced contracts covered four distinct areas of the country:

---

[1] *See* https://www.fbo.gov/index.php?s=opportunity&mode=form&id=65a89e7a591601594163c7f6a76ce601&tab=core&_cview=1 last retrieved on June 27, 2018.

- American Purchasing Services, LLC/American Medical Depot's contract includes MA, ME, VT, NY, CT, NJ, PA, DE, NH, WV, MD, VA, RI, NC, FL, DC, and Puerto Rico.

- Cardinal Health 200, LLC's contract includes CO, UT, NM, AZ, CA, OR, ID, NV, WA, HI, AL, and Guam.

- Kreisers, LLC's contract includes KY, TN, OH, IN, IL, WI, MN, MI, MO, IA, KS, NE, ND, SD, MT, and WY.

- Medline Industries, Inc.'s contract includes AL, GA, SC, AR, LA, MI, OK, and TX.

21.     Within their territories, each distributor is responsible for warehousing and shipping medical supplies purchased by the VA to the VA's medical facilities.

22.     Because these four prime vendor contracts were only distribution contracts, medical suppliers contracted directly with the VA Strategic Acquisition Center ("SAC"). Such contracts were based on the SAC's or individual medical facility's desire to purchase certain products.[2]

23.     Thus, in the typical MPSV-NG purchase, the VA places an order with its Prime Vendor, the medical supplier who contracted with the VA honors the agreed-upon price, and the Prime Vendor distributes the ordered product to the VA. The arrangement long has permitted efficiency in ordering and acquisition by the VA because it consolidated products sold by all of the necessary suppliers at the Prime Vendor for easy, one-step ordering and distribution to the VA.

24.     A report issued by GAO in November 2017[3] illustrated the MSPV-NG program as follows:

---

[2] This also allowed specific medical facilities to procure products based on their unique needs.

[3] GAO-18-34 available at https://www.gao.gov/assets/690/688269.pdf. Hereinafter the "GAO Report."



Figure 2: Medical Surgical Prime Vendor-Next Generation (MSPV-NG) Program Structure and Key Participants

Source: GAO analysis of Veterans Affairs contracts and policies. | GAO-18-34

25.     As of the time of the J&A, the MSPV-NG formulary contained approximately 7,800 items.  J&A at 2.  The VA procures many medical/surgical supplies outside the MSPV-NG program, through the Federal Supply Schedule program, other contract vehicles, and open-market purchases.  The VA estimates that approximately 80,000 items are required in total.  *See id.*

26.     The GAO Report also provided a comprehensive outline of the MSPV-NG program and took the VA to task for its slipshod implementation of the program.

27.     GAO first outlined the program goals for MSPV-NG, which includes:

- "Standardize requirements for supply items for greater clinical consistency."

- "Achieve cost avoidance by leveraging VA's substantial buying power when making competitive awards; VA set a goal of achieving $150 million in cost avoidance in 2016 through a supply chain transformation effort, of which MSPV-NG is a primary part."

- "Achieve greater efficiency in ordering and supply chain management, including a metric of ordering 40 percent of medical centers' supplies from the MSPV-NG formulary."

- "Involve clinicians in requirements development to ensure uniform clinical review of medical supplies."

28.     The J&A's rationale for the modification does not achieve these goals.  By using four different distributors to purchase and negotiate prices for formulary items, the VA will not be standardizing the supply items, will not be leveraging the Agency's buying power, will not achieve efficiency in management, and will not be able to ensure that clinicians participate in review of the medical supplies.

29.     GAO documented the VA's management challenges with implementing the MSPV-NG program and was sharply critical of VA's ability to handle a program of this complexity and magnitude:

- "VHA's implementation of the MSPV-NG program…was not executed in line with leading practices."

- "VHA lacked a documented program strategy, leadership stability, and workforce capacity for the transition that—if in place—could have facilitated buy-in for the change throughout the organization."

- "VHA developed an initial formulary that did not meet the needs of the medical centers."

- "VHA has not yet achieved its goals for utilization and cost avoidance."

30.     These management challenges cannot now be used as an excuse for this J&A (especially where, as here, it would exacerbate the challenges highlighted by GAO).

31.    GAO also observed that the VA lacked a strategy for implementing the MSPV-NG program, suffered from leadership vacancies and turnover in key positions, and limited clinician involvement in prioritizing supplies that would be part of the MSPV-NG program. GAO concluded that "[a]ny major organizational change requires a solid strategic plan that is communicated with stakeholders, stable leadership, and stakeholder involvement and buy-in. VHA was missing all of these elements when it rolled out the MSPV-NG program, which presented obstacles to effective implementation and buy-in and affected the program's ability to meet its goals." *See* GAO Report, page 43.

32.    GAO issued 10 recommendations aimed at transforming VHA's approach to how it procures supplies to the MSPV-NG program and VHA concurred with all 10 recommendations. It is unclear which, if any, of the recommendations that the VA has implemented.

33.    Instead of addressing the underlying issues referenced in the GAO Report, VA has instead sought to add complexities to its MSPV-NG program by creating a new program through the J&A that adds a layer to the process of purchasing medical and surgical supplies, minimizes the opportunity for standardization and scale, and creates a system under which medical and surgical suppliers can select their own products without any oversight by the VA, eliminates competition for supplies, and effectively precludes small business (including SDVOSBs and VOSBs) from contracting with the VA to supply the products.

34.    In April 2018, the VA issued the J&A impacting the following contracts:

| VA Contract Number | Prime Vendor Contractor |
|---|---|
| VA119-16-D-0002 | Kreisers, Inc. |
| VA119-16-D-0004 | American Medical Depot (AMD) |
| VA119-16-D-0005 | Cardinal Health 200, Inc. |
| VA119-16-D-0006 | Medline Industries, Inc. |

35.     With the stated goal of greatly expanding the number of products that the VA purchases under its  MSPV-NG program, the J&A converts the Prime Vendors' Contracts from distribution contracts to "supply and distribution" contracts. That is, the J&A contemplates that the Prime Vendors will be responsible for determining which products will be available through the program as well as the products' prices.  This is significant because, previously, suppliers selling products covered by the above contracts were prime contractors to the federal government and were selected as sources of supply by the VA through the acquisition process. Under the J&A, the rights of the suppliers to be prime contractors to the federal government is eliminated. They must now contract with the Prime Vendors if they want access (albeit indirectly) to VA's marketplace for products on the formulary or to be added to the formulary. No matter whether considering the contracts prior to the J&A or after, the VA medical centers must order items on the formulary through the prime vendor program. The modifications consolidate the Prime Vendors' existing distribution function with all of the supply requirements of the VA for products on the formulary or that will be added to the formulary.

36.     Specifically, the J&A provides that the Prime Vendors will assume the market research and pricing governmental functions.  J&A at 3.

37.     The government's role in procuring these supplies will to be to approve the new supply subcontract between the Prime Vendor and the supplier based on the name of the supplier and the price, both of which are screened, determined, and provided by the Prime Vendor; not the Government.  J&A at 3.[4]

_____

[4] While the VA argues at one point that the J&A "does not change the contract scope" (*see* J&A page 5), this is belied by the previous paragraphs and the Government's admission that the J&A converts the four distribution contracts to distribution *and supply* contracts. The role of the Prime Vendors will expand significantly if the J&A is implemented, beyond any foreseeable scope identified in the solicitation for the existing distribution contracts.

38.	There is no specific competition or market research required for the Prime Vendor. Nor is there any requirement to comply with the legal requirement that the VA give preference in contracting to SDVOSBs and VOSBs.  The J&A even permits the possibility that the Prime Vendor will supply its own product at the expense of all other suppliers.

39.	In fact, the J&A anticipates that the Prime Vendor will utilize its existing supply network to fulfill any new requirements.  This will eliminate the possibility of an award to any supplier not currently in the Prime Vendor's supply chain or which does not agree to all conditions set by the Prime Vendor to join that network.  The J&A only provides three restrictions on such terms (J&A at 9), none of which will protect current offerors for BPAs from unreasonable terms, including payment of rebates and fees required by the prime vendors or from prime vendors selecting their own products to supply.

40.	The extremely limited information that will be provided by the Prime Vendor to the government for approval is insufficient for it to perform a responsibility determination and other inherently governmental functions.

41.	In addition, contrary to the J&A's assertions, this process will not save the government money because it eliminates competition from these awards, which would actually save the government money. Instead, the Government will cede control of the contracting prices, lose insight into the pricing of suppliers, and wipe away any potential competition to supply covered medical goods to VA's health centers.

42.	The Prime Vendors, instead, can provide any price to the government under their new government sanctioned monopolies and the government will have no choice but to accept it or face delays that this process is intended to prevent.

43.     While this new process will certainly make the VA's job easier, as it has outsourced its inherently governmental procurement function, it will not ensure a safer supply chain or save the government money, and it will breach the VA's obligations to veteran-owned businesses.

44.     Instead, it will only serve to enrich the prime vendors who will become quasi-governmental entities.

45.     Initially, in the J&A, the VA notes the J&A is needed because of the VA's inability to manage its own supply chain ("the MSPV-NG has fallen considerably short of the intended outcomes."). As a solution, the J&A approves a system under which four private vendors will manage the VA's supply chain. These four contractors will be responsible for determining which products will be on the formulary as well as the products' prices. There is no clear mechanism for the VA to determine whether the prices being offered are fair and reasonable; especially since the VA will not possess any kind of audit rights or protections offered with other contract vehicles (such as GSA Schedules).

46.     Furthermore, some of the prime vendors have their own private label products that would compete with products manufactured or provided by suppliers to the VA.

47.     In essence, the VA has thrown up its hands and given up on its ability to manage its own supply chain and is outsourcing that requirement to four entities through sole sourced contracts at the expense of SDVOSBs that are critical to the VA's mission.

48.     Nevertheless, the SAC's rollout of the new J&A has suffered from the same infirmities it stated it was trying to avoid. On May 11, 2018, the SAC issued a "clarification" document. Instead of a quick ramp up that will solve all of VA's ills, the clarification document provides that products from just four manufacturers will be utilized under the new J&A initially

with no definitive time frame to add additional products.  This demonstrates that the stated basis for the J&A is not justified.

## COUNT I

### IMPROPER SOLE SOURCE OR LIMITED SOURCE JUSTIFICATION

49.     The allegations of the preceding paragraphs are hereby incorporated by reference.

50.     Executive agencies are normally required to obtain property and services through full and open competition, although they may use noncompetitive procedures in certain circumstances. *See* 41 U.S.C. §§ 3301(a), 3304(a).

51.     The VA states that "the statutory authority permitting other than full and open competition is 41 U.S.C. 3304(a)(1) as implemented by the Federal Acquisition Regulation (FAR) Subpart 6.302-1 entitled, 'Only One Responsible Source and No Other Supplies Will Satisfy Agency Requirements.'   Full and open competition need not be provided for when supplies required by the agency are available from only one responsible source or from only one or a limited number of responsible sources, and no other type of supplies will satisfy agency requirements."

52.     Here, the Government's requirements are already being met by existing suppliers. The Government makes no claim (nor can it) that the VA's physicians have been unable to treat their patients due to unavailability of supplies. Rather, the agency's concern is with the contractual vehicle through which these supplies are procured. Indeed, the VA wishes to put in place different vehicles to buy the same supplies. This provides no justification for sole source "one responsible source" award.

53.     The VA's use of the "Only One Responsible Source" justification highlights the fact that the J&A, in effect, creates sole source awards to the prime vendors for the supply of health care supplies to the VA in each of their assigned regions.

54.     The Federal Circuit has instructed that a sole-source contract may be set aside if: "(1) the sole-source award lacked a rational basis; or (2) the sole-source procurement procedure involved a violation of a statute, regulation, or procedure." *Glob. Dynamics, LLC v. United States*, No. 17-1875C, 2018 WL 1312051, at *5 (Fed. Cl. Mar. 14, 2018), *citing Emery Worldwide Airlines, Inc. v. United States*, 264 F.3d 1071, 1086 (Fed. Cir. 2001).  In evaluating the propriety of a sole-source contract award, the court must "determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion." *Id. citing Impresa Construzioni Geom. Domenico Garufi v. United States,* 238 F.3d 1333 (Fed. Cir. 2001).

55.     Particularly apt here is this court's observation that, "sole-source procurements may not be used when the circumstances justifying the award were due to the agency's own lack of advanced planning." *Id. citing Innovation Dev. Enterprises of Am., Inc. v. United States*, 108 Fed.Cl. 711, 728 (2013) (holding that the "[f]ailure to account for transition periods between an incumbent contractor and a new contractor is ... a form of lack of advanced planning"); 41 U.S.C. § 3304(e)(5)(A)(i) ("In no case may the head of an agency ... enter into a contract for property or services using procedures other than competitive procedures on the basis of the lack of advanced planning."); 48 C.F.R. § 6.301(c)(1) (2017) ("Contracting without providing for full and open competition shall not be justified on the basis of a lack of advanced planning by the requiring activity.").  Even if, *arguendo*, the VA's actions do not amount to creation of sole source procurements, the same principles apply to a limited-source procurement.

56.     Here, the VA states that "[a]ny attempt to award the required supplies through a different source would cause unacceptable delays in fulfilling the VA's requirements that would directly impact the health, safety, quality and timeliness of case to Veterans."  (J&A at 5.)

57.     However, this circumstance is due solely to the VA's own lack of advanced planning. The VA admits that "the MSPV-NG has fallen considerably short of the intended outcomes" and that the expanded scope of the Contracts is proposed in order to address concerns resulting from "VA's current supply chain inefficiencies…" (J&A at 1.) It is clear from the J&A that the proposed Contract modifications are "necessary" only in that the VA believes they would temporarily cure flaws the VA has identified with how it originally structured the MSPV-NG program until longer-term remedies can be implemented. In other words, the VA's lack of advanced and proper planning in transitioning from the MSPV program to MSPV-NG outlined in the GAO Report is the sole cause of the planned scope modifications.

58.     Further, while the VA argues that only the Prime Vendors can meet the expanded supply needs, it describes alternative methods by which items are, in fact, currently being supplied:

> Currently, VA's healthcare facilities are utilizing a variety of non-preferred contract methods to procure necessary items not available on the Government master list. The substantial number of necessary items that are unavailable in the catalog complicates local delivery and logistics and often leads to higher costs for these supplies. This includes significant over-reliance on GPCs transactions, which jeopardizes the MSPV-NG program's ability to adequately monitor and review supplies being purchased and used for direct patient care. Without the ability to adequately monitor and review the purchased supplies through the Government master list, there is extreme risk to patient health and/or safety when it comes to ensuring the supplies are compliant with Food and Drug Administration (FDA) regulations for medical supply items, monitoring and conducting appropriate safety and defective-item recalls, and compliance with all Buy-American Act (BAA) and/or Trade-Agreements Act (TAA) compliant items. Currently, the required Government master list has only a mere fraction of the required supplies needed for adequate patient care, health, and safety needs. The current acquisition-like process for determining items, prices, and suppliers on the master list involves soliciting industry and awarding Blanket Purchase Agreements (BPAs) to vendors meeting the stated requirements at the lowest offered price. However, actual orders are never issued against these BPAs. The BPA process serves only to identify the items and prices for the PV's distribution agreement with the BPA holder. No Government funds are disbursed directly to the BPA holder, only to the PV. Although this process awards no contracts per se, it exposes the Master List generation process to all of the delays inherent in the acquisition process including multiple protests, spotty vendor response, and several rounds of canceled competitive solicitations.

59.     The fact that the alternatives to sole-sourcing the desired items are "not preferred" by the VA and that the existing approach subjects the procurements "to all of the delays inherent in the acquisition process" is not a sufficient basis to justify a sole source or limited source procurement of the items.  This is especially true where, had the VA engaged in proper planning, it could have structured the MSPV-NG program differently to allow for competition of the supply element. Indeed the initial distribution contract award to the Prime Vendors is itself ample proof of the fact that, at that time, the VA believed that there were other sources for supply of the products.  The only thing that has changed is the VA's delay.

60.     Further, even where competition can be properly limited under the applicable statutes and regulations, agencies are nevertheless legally obligated to request offers from as many potential sources as practicable under the circumstances.  41 U.S.C. § 3304(d); FAR § 6.303–2(a)(6).  The Agency appears to have taken no steps to evaluate the broadest possible limited source procurement.

61.     The VA states that the current Prime Vendors "are positioned and equipped to assume the sourcing and distribution of requirements to be added as a result of this J&A because they already have established commercial contracts with suppliers and have existing relationships with many of the suppliers where products need to be added." (*Id.* at 6.)  This statement credits the distributors for having relationships with the suppliers while ignoring the option of contracting directly with suppliers. A variety of contract vehicles are currently in place, including Federal Supply Schedule contracts, through which the VA can procure the required healthcare supplies from numerous other sources, including the Plaintiffs.

62.     The sole-source or limited-source awards effectuated to the Prime Vendors through the contract modifications are improper, arbitrary and capricious, and contrary to law.

## COUNT II

## IMPROPER BUNDLING

63.     The allegations of the preceding paragraphs are hereby incorporated by reference.

64.     The Small Business Act requires contracting agencies, "[t]o the maximum extent practicable," to use "procurement strategies … [that] facilitate the maximum participation of small business concerns as prime contractors, subcontractors, and suppliers." 15 U.S.C. § 644(e)(1). As part of the mandate to facilitate contracting with small businesses, agencies must, "to the maximum extent practicable, … avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors." 15 U.S.C. § 631(j)(3). The Act defines the term "bundling of contract requirements" to mean "consolidating 2 or more procurement requirements for goods or services previously provided or performed under separate smaller contracts into a solicitation of offers for a single contract that is likely to be unsuitable for award to a small-business concern due to—(A) the diversity, size, or specialized nature of the elements of the performance specified; (B) the aggregate dollar value of the anticipated award; (C) the geographical dispersion of the contract performance sites; or (D) any combination of the factors described in subparagraphs (A), (B), and (C)." 15 U.S.C. § 632(o)(2).

65.     Here, the proposed modifications to the Prime Vendors' Contracts bundle contracting requirements by consolidating the Prime Vendors' distribution function with the *supply* of healthcare supplies, which has previously been performed in part by small businesses.

66.     Individual small businesses, including the Plaintiffs, are capable of supplying portions of the VA's healthcare supply needs, and have done so through the existing MSPV-NG program and through other contractual mechanisms. The modifications have the effect of bundling all of those supply requirements under the Prime Vendors' prime contracts, huge contracts that are

unsuitable for small businesses—and, in any event, have been granted to the Prime Vendors without competition.

67.     There is no evidence that the VA has followed the required procedures to determine whether the bundling is necessary and justified.

68.     The Small Business Act requires the "head of an agency" to "conduct market research to determine whether consolidation of the requirements is necessary and justified" "[b]efore proceeding with an acquisition strategy that could lead to a contract containing consolidated procurement requirements."  15 U.S.C. § 644(e)(2)(A).  A head of an agency may determine that the consolidation of requirements is "necessary and justified if, as compared to the benefits that would be derived from contracting to meet those requirements if not consolidated, the Federal Government would derive from the consolidation measurably substantial benefits, including any combination of benefits that, in combination, are measurably substantial."  *Id.* at § 644(e)(2)(B).  The FAR provision that implements this statutory requirement states that "[t]he agency shall quantify the specific benefits identified through the use of market research and other techniques to explain how their impact would be measurably substantial."  48 C.F.R. § 7.107-3(b).  It further provides that "[b]enefits are measurably substantial if individually, in combination, or in the aggregate the anticipated financial benefits are equivalent to—(1) Ten percent of the estimated contract or order value (including options) if the value is $94 million or less; or (2) Five percent of the estimated contract or order value (including options) or $9.4 million, whichever is greater, if the value exceeds $94 million."  48 C.F.R. § 7.107-3(d).

69.     In this analysis, the Small Business Act warns that "[t]he reduction of administrative or personnel costs alone shall not be a justification for bundling of contract requirements unless the cost savings are expected to be substantial in relation to the dollar value

of the procurement requirements to be consolidated." *Id.* at § 644(e)(2)(C). The FAR defines "substantial" cost savings as "at least ten percent of the estimated contract or order value (including options) of the bundled requirements." 48 C.F.R. § 7.107-3(e).

70. The Small Business Act further requires the agency, if it determines that an acquisition plan for a procurement involves a substantial bundling of contract requirements, to "publish a notice on a public website that such a determination has been made not later than 7 days after making such determination." 15 U.S.C. § 644(e)(3). FAR 7.107-4 defines "substantial bundling" for the VA as bundling of requirements estimated at $2.5 million or more. 48 C.F.R. § 7.107-4(a)(1)(iii), (2). The agency must publish a justification for its determination with respect to substantial bundling, including:

> (A) The specific benefits anticipated to be derived from the bundling of contract requirements and a determination that such benefits justify the bundling.

> (B) An identification of any alternative contracting approaches that would involve a lesser degree of bundling of contract requirements.

> (C) An assessment of—

>> (i) the specific impediments to participation by small business concerns as prime contractors that result from the bundling of contract requirements; and

>> (ii) the specific actions designed to maximize participation of small business concerns as subcontractors (including suppliers) at various tiers under the contract or contracts that are awarded to meet the requirements.

*Id.* at § 644(e)(3).

71. Further, the FAR requires an agency that is preparing to consolidate or bundle requirements to provide a copy of the proposed acquisition package to the Small Business Administration, along with a statement explaining why the consolidation or bundling is necessary and justified. 48 C.F.R. §§ 7.107-5(c); 19.202-1(e)(1)(iii), (2)(v). These procedures give the SBA

an opportunity to recommend to the contracting agency alternative contracting methods to increase small business prime contracting opportunities. *See* FAR 19.403(c)(2). If the agency rejects SBA's recommendations, it must document the basis for such rejection and notify the SBA. FAR 19.202-1(e)(4).

72.     Here, the J&A does not contain any analysis by the VA of whether bundling its supply requirements, including those that previously have and could in the future be performed by small businesses, with distribution requirements is necessary and justified. There is no comparison of the benefits of contracting to meet those requirements without consolidation, including by contracting with small businesses for supplies, against the benefits of consolidating the requirements. There is no evidence that the head of the agency for the VA made any finding that the benefits of bundling are "measurably substantial" in comparison with the benefits of contracting without consolidation. There is no evidence of market research conducted by the head of the agency for the VA that supports such a finding. Nor did the VA publish a notice of its determination to bundle the requirements and justification for that determination. The J&A itself contains no cost/benefit analysis of the bundling, no identification of any alternative contracting approaches that would involve a lesser degree of bundling of contract requirements, and no assessment of impediments to small business participation as prime contractors that result from bundling or actions to maximize small business participation as subcontractors.

73.     It is apparent that the VA entirely failed to conduct the required analysis and to consider the impact of its bundling of requirements on the small businesses, including SDVOSBs and VOSBs, that are capable of supplying portions of VA's healthcare supply requirements.

74.     Nor is there any evidence that the VA complied with its obligations to notify SBA and incumbents and consider SBA's recommendations with respect to alternative approaches.

75.     In fact, there is no substantial benefit to be derived from bundling the requirements in comparison to continuing to acquire healthcare supplies without bundling.  The effect will be primarily to shift the sources of supply away from the VA's current set of suppliers, which include many SDVOSBs and VOSBs, to suppliers preferred by the Prime Vendors.  This is because statutory law requires the VA to restrict competition to veteran-owned and -controlled small businesses if there is a reasonable expectation that two or more such businesses will submit offers at fair and reasonable prices, known as the "Rule of Two" (*see* 38 U.S.C. § 8127(d)). The Prime Vendors are not bound by the Rule of Two.  The VA will lose the benefit of providing contracting opportunities for small, veteran-owned and -controlled businesses.  Given the policy goal reflected in the Veterans Benefit, Health Care, and Information Technology Act that the VA should "increase contracting opportunities" for SDVOSBs and VOSBs, this is a substantial detriment to the VA.  There is no evidence that the VA even considered the impact to small businesses, and particularly to veteran-owned and -controlled small businesses, of its bundling of the supply and distribution requirements under the Prime Vendors' contracts.

76.     While the J&A purports to identify an estimated cost savings of $32 million (*see* J&A at 7), that does not satisfy the VA's obligations to justify the bundling.  Notwithstanding the VA's statement of this estimate, the J&A contains no specific analysis of the costs and benefits of *bundling* relative to obtaining supplies *without bundling*.  Notably, the $32 million estimate appears to be based on the VA's sense of difference in cost between the purchase items using Government Purchase Cards ("GPCs") on one hand and through the MSPV-NG program on the other.  But that is not the relevant comparison for purposes of a proper bundling analysis.  Options to reduce costs *relative to GPC purchases* are available without going so far as to bundle all supply requirements together under a single prime contract.  For example, the VA could add items to the

existing MSPV-NG formulary instead of utilizing single, one-off GPC purchases. It could purchase items through the FSS program or other contract vehicles. There is no evidence that VA considered whether there is any difference in costs between these strategies, which would avoid unnecessary bundling, and the J&A's proposed approach.

77. The J&A also attempts to justify the proposed modifications on the basis of administrative efficiencies but, as noted above, the Small Business Act and its implementing regulations provide that the reduction of administrative or personnel costs alone shall not be a justification for bundling of contract requirements unless the cost savings are expected to be at least ten percent of the estimated value of the bundled requirements. In the J&A, the VA makes no effort to quantify the cost savings of the purported administrative efficiencies, and it is implausible that they amount to ten percent or more of the value of the VA's enormous requirement for healthcare supplies.

78. In the absence of any reasonable finding that substantial benefits outweigh the loss of contracting opportunities for small, veteran-owned and -controlled businesses, the VA's bundling decision is contrary to law and lacks a rational basis.

## COUNT III

### FAILURE TO CONSIDER THE PRIME VENDORS' IMPAIRED OBJECTIVITY ORGANIZATIONAL CONFLICTS OF INTEREST

79. The allegations of the preceding paragraphs are hereby incorporated by reference.

80. An "impaired objectivity" Organizational Conflict of Interest ("OCI") occurs when a government contractor has conflicting obligations under *different* government contracts, that compromise the contractor's ability to render impartial judgment. *Axiom Res. Mgmt., Inc. v. United States*, 82 Fed. Cl. 522, 525 (2008), *citing* 48 C.F.R. § 9.505–3; *Aetna Gov't Health Plans, Inc.,* Comp. Gen. B–254397.15, 1995 U.S. Comp. Gen. LEXIS 502, 1995 WL 449806 at *9.

81.    The J&A states that the four private vendors will manage the VA's supply chain. These four contractors will be responsible for determining which products will be available through the program as well as the products' price.    Yet, as the J&A states, the Prime Vendors "already have established commercial contracts with suppliers and have existing relationships with many of the suppliers where products need to be added."  (J&A at 6.)    In addition, some of the Prime Vendors have their own product lines that are listed on the formulary or could be added to the formulary.

82.    Prime Vendor A accordingly will be free to supply its own products to supply the VA, regardless of whether there is another product from another supplier available at a lower price, for example.  Even where the Prime Vendors do not have their own products to offer, they would have conflicting obligations under the modified Contracts, resulting from their established relationships with various suppliers.  For example, Prime Vendors receive rebates and fees from suppliers that differ one to another and which may result in choices favoring the Prime Vendor, but not the Government. The J&A does not consider this structural deficiency.  This structural defect in the procurement harms Plaintiffs because they will be competing against the Prime Vendors in their dual roles as suppliers and with suppliers with which the Prime Vendors have established relationships.

83.    The VA's improper outsourcing of the inherently governmental function of evaluating and selecting suppliers for these products has created a clear impaired objectivity OCI. The Prime Vendors would be determining – on behalf of the Government – whether their own products or the products of their competitors should be supplied.  This is especially troubling because the VA would not have insight into the distribution agreements the Prime Vendors have with manufacturers outside the MSPV-NG program that could impact the prices the Prime Vendor

is offering to the VA.  In the end, a Prime Vendor's obligations outside of its role as a Prime Vendor could impact its offers to the VA and the VA would be completely unaware.

84.     Here, the OCI is built into the contract's structure and arises as soon as the contract is modified.  The contract places the MSPV-NG Prime Vendors, acting as the source selectors and price negotiators, in the position to evaluate and select their own products.

## COUNT IV

### THE PROCUREMENT STRUCTURE ITSELF CREATES AN IMPERMISSIBLE PERSONAL CONFLICT OF INTEREST

85.     The allegations of the preceding paragraphs are hereby incorporated by reference.

86.     A "personal conflict of interest" means a "situation in which an employee has a financial interest, personal activity, or relationship that could impair the employee's ability to act impartially and in the best interest of the Government when performing under the contract."  FAR § 3.1101.  The employee must be one who performs an acquisition function closely associated with inherently governmental functions.  *Id.*

87.     By way of example, GAO found that a contractor employee had a personal conflict of interest when, following corporate acquisitions and reorganizations, an employee of "new" company still owned stock in "old" company.  As part of employment with "new" company, the employee assisted an agency Source Selection Evaluation Board ("SSEB") in a procurement involving "old" company.  The employee therefore had a personal conflict of interest arising from his stock ownership.  *See BAE Systems Solutions & Services, Inc.,* B- 411810.3, June 24, 2016, 2016 CPD ¶ 174  (personal conflict of interest was disclosed, employee divested stock, and employee was not in a decision-making role).

88.     Here, Prime Vendor employees will be placed in a position to decide sources and prices, and to direct awards to suppliers that are affiliated with the Prime Vendor – in other words,

to increase sales and profits.  Increasing sales and profits are typically tied to compensation in for-profit entities like the Prime Vendors.  Like the OCI problem, the VA's modification of the MSPV distribution contracts establishes an inherent personal conflict of interest.

<u>COUNT V</u>

**IMPROPER DELEGATION OF INHERENTLY GOVERNMENTAL FUNCTION TO PRIME VENDORS**

89.     The allegations of the preceding paragraphs are hereby incorporated by reference.

90.     "[T]he FAR provides that agencies will not award contracts for the performance of inherently governmental functions, and includes as examples of inherently governmental functions in federal procurement activities 'with respect to prime contracts' the awarding, administering and/or terminating contracts. FAR sect. 7.503(a), (c)(12)."  *2b Brokers et al.*, B-298651, Nov. 27, 2006, 2006 CPD ¶ 178.

91.     "In this regard, the FAR defines an 'inherently governmental function' as one that is so intimately related to the public interest as to mandate performance by government employees, and notes that governmental functions fall into two categories: the act of governing (that is, the discretionary exercise of government authority), and monetary transactions and entitlements. FAR sect. 2.101."  *2b Brokers et al.*, B-298651, Nov. 27, 2006, 2006 CPD ¶ 178.

92.     "Section 2383 of Title 10 of the United States Code further provides that an agency may award a contract 'for the performance of acquisition functions closely associated with inherently governmental functions' only where there are no appropriate [government] personnel available to perform the functions; that the contractor will be supervised by [government] personnel who will perform 'all inherently governmental functions associated with the functions to be performed under the contract'; and any potential organizational conflict of interest of the

contractor in the performance of the functions under the contract has been addressed." *2b Brokers et al.*, B-298651, Nov. 27, 2006, 2006 CPD ¶ 178.

93.     Here, the J&A states that the Prime Vendors will "leverage their existing commercial network in order to propose sources and prices for items identified by the MSPV Program Office." (J&A at 3.) This will allow the Prime Vendors to assume the market research and price discovery functions. (*Id.*)

94.     The VA's role will be an "examination of the prices and sources identified by the [Prime Vendor] by the MSPV-NG Program Office and SAC's contracting team, [after which] approved items will be added to the Government master list." (J&A at 3.)

95.     Thus, the Government is outsourcing these inherently government or closely associated governmental functions in violation of FAR 7.503.

96.     The Prime Vendors would be determining – on behalf of the Government – whether their own products or the products of their competitors should be supplied. Even where the Prime Vendors do not have their own products to offer, they would have conflicting obligations under the "distributor" portion of the modified Contracts, under which they have established relationships with various suppliers, and under the portion of the contract where they serve as the supplier or negotiate with suppliers on behalf of the VA.

97.     Under the J&A, only those in the Prime Vendor's supply chain or which agree to all conditions set by the Prime Vendor to join that network would be capable of obtaining a subcontract award, and no ability to obtain a prime contract award.

## COUNT VI

### FAILURE TO COMPLY WITH "VETERANS FIRST" CONTRACTING REQUIREMENTS

98.     The allegations of the preceding paragraphs are hereby incorporated by reference.

99.     Congress has enacted various policies and statutory requirements to enhance the contracting opportunities for veteran-owned small businesses ("VOSBs") and service-disabled veteran-owned small businesses ("SDVOSBs") with the VA.  Among these is the "Rule of Two," reflected in 38 U.S.C. § 8127(d), which provides that, with certain exceptions, "a contracting officer of the [VA] shall award contracts on the basis of competition restricted to small business concerns owned and controlled by veterans if the contracting officer has a reasonable expectation that two or more small business concerns owned and controlled by veterans will submit offers and that the award can be made at a fair and reasonable price that offers best value to the United States."

100.    The United States Supreme Court has ruled that the text of 38 U.S.C. § 8127(d), "requires the Department to apply the Rule of Two to all contracting determinations and to award contracts to veteran-owned small businesses."  *Kingdomware Techs., Inc. v. United States*, 136 S. Ct. 1969, 1972, 195 L. Ed. 2d 334 (2016).

101.    The Court noted that the statute provides that the contracting officer "shall award contracts" using competition restricted to small, veteran-owned businesses except for certain enumerated exceptions, and found that the use of the word "shall" "demonstrates that § 8127(d) mandates the use of the Rule of Two in all contracting before using competitive procedures." *Id.* at 1977 (emphasis added) (citing 38 U.S.C. § 8127(d)). The court found that "[e]xcept when the Department uses the noncompetitive and sole-source contracting procedures in subsections (b) and (c) [which deal with noncompetitive awards to veteran-owned businesses], § 8127(d) requires the Department to use the Rule of Two before awarding a contract to another supplier."  *See PDS Consultants, Inc. v. United States*, 132 Fed. Cl. 117, 123 (2017).

102.    While *Kingdomware* and section 8127(d) require the VA to perform a Rule of Two inquiry that favors VOSBs and SDVOSBs "in all contracting *before using competitive procedures*"

and limit competition to veteran-owned small businesses when the Rule of Two is satisfied, the broader rule is that "before contracting with a non-veteran-owned business, the Department must first apply the Rule of Two." 136 S.Ct. at 1977. It would make little sense for this rule to require application of the Rule of Two before the VA uses full and open procedures, but not when the VA awards to non-veteran-owned entities without conducting full and open procedures.

103. Here, the VA clearly failed to meet its statutory obligations to veteran-owned businesses. The J&A contains no evidence that the VA considered whether two or more SDVOSBs or VOSBs can provide the supplies that the VA proposes to purchase exclusively from the Prime Vendors. Indeed, for many supplies, SDVOSBs and VOSBs <u>already</u> are meeting the existing requirements. Under the proposed modifications, because the VA would contract with the Prime Vendors to purchase healthcare supplies, it would not apply the Rule of Two to those purchases.

104. The VA states that "it anticipates being able to generate increased Veteran-owned business opportunities" through the expanded scope of the Prime Vendor contracts and by "negotiating individual subcontracting plans" with the Prime Vendors "in order to address subcontracting with Veteran Owned Small Business and Service Disabled Veteran Owned Small Businesses." (J&A at 12.) However, the modifications would eliminate the opportunity for veteran-owned businesses to compete, under the Rule of Two, for sales of supplies. There is no rational basis to conclude that this will *increase* the opportunities available to veteran-owned businesses. Moreover, the law does not treat *subcontracting* opportunities and prime contracting opportunities equally—the Rule of Two is not satisfied by making award to a large business and hoping that the prime contractor will subcontract with SDVOSBs or VOSBs. Simply stating that

the Prime Vendors will be able to subcontract some of the work scope to veteran-owned businesses, does not meet the VA's obligations towards veterans.

**COUNT VII**

**VIOLATION OF THE COMPETITION IN CONTRACTING ACT**

105.    The allegations of the preceding paragraphs are hereby incorporated by reference.

106.    The Competition in Contracting Act ("CICA") "generally directs executive agencies, 'in conducting a procurement for property or services' to 'obtain full and open competition though the use of competitive procedures.'" *Ian, Evan & Alexander Corp. v. United States*, 136 Fed. Cl. 390, 413 (2018) (citing 41 U.S.C. § 3301(a)(1) (2012)).

107.    CICA was "designed to increase the use of competition in government contracting and to impose more stringent restrictions on the awarding of noncompetitive 'sole source' contracts." H.R. Conf. Rep. No. 861, 98th Cong., 2d Sess. at 1421, reprinted in 1984 U.S. Code Cong. & Ad. News 697, 1445, 2109. The Conference Report on CICA rejected "effective" competition as too low a standard for government procurements, and instead substituted "full and open" competition as the standard, "to emphasize that all responsible sources are permitted to submit bids or proposals for a proposed procurement." *Id.* at 1422, 2110.

108.    The government may not structure a contract so as to avoid this required competition. *See Glob. Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 350, 413 (2009), *modified on reconsideration*, 88 Fed. Cl. 466 (2009) ("Thus, while Congress extended to contracting officers 'wide latitude' so that they 'will not be constrained by CICA requirements in defining the nature of the procedures that will be used in selecting the contractor to perform a particular task order,' it simultaneously cautioned that task order contracts "must be structured

carefully to ensure that *they are not abused to avoid competition and funnel money to favored contractors*." (citations omitted) (emphasis in original)).

109. At present, SDVOSBs and VOSBs compete to provide their products to the VA.

110. Here, the VA seeks to avoid CICA's mandated competition through creating a structure pursuant to which no competition is conducted involving SDVOSBs or VOSBs, or, for that matter, <u>any</u> supplier that is also a distributor. Rather, the scope of the proposed supply and distribution Prime Vendor MSPV-NG contracts will be so broad that no competition will be required for the extensive new requirements that the VA intends to add to the master list.

111. The VA seeks to avoid CICA competition requirements through delegating its broad procurement functions to the Prime Vendors who then will conduct each new procurement of supplies without observing CICA's restrictions and without competition or providing a justification for the lack of competition.

112. This structure violates CICA and this Court's previous finding that contracts "must be structured carefully to ensure that *they are not abused to avoid competition and funnel money to favored contractors*." *Glob. Computer Enterprises, Inc. v. United States*, 88 Fed. Cl. 350, 413 (2009), *modified on reconsideration*, 88 Fed. Cl. 466 (2009).

## COUNT VIII

### THE CONDITIONS FOR AN INJUNCTION ARE PRESENT

113. The allegations of the preceding paragraphs are hereby incorporated by reference.

114. The Court should enjoin the VA from modifying the Contracts or otherwise proceeding with a sole or limited-source procurement with respect to supplying the medical/surgical supplies at issue. The four factors for preliminary and permanent injunctive relief are present here.

115.    First, as discussed above, the Plaintiffs succeed on the merits.

116.    Second, the Plaintiffs would be irreparably harmed if the requested injunction is not granted because they have no adequate remedy in the absence of an injunction. The Plaintiffs would lose the opportunity to compete as suppliers of these products to be added to the formulary, as well as the revenues and experience that they would gain through performance.

117.    Third, the balance of hardships favors the Plaintiffs. As discussed above, any harm to the VA is the result of its own lack of advanced planning, and therefore cannot possibly outweigh the irreparable harm to the Plaintiffs. Further, the VA admits that it has multiple existing avenues for purchase of these products, minimizing the potential harm to the Government.

118.    Fourth, the public interest would be better served by granting the injunction because the public's interest lies in preserving the integrity of competitive procurements. Permitting the VA to make contract modifications that amount to sole source awards because it failed to anticipate its needs under a sweeping new program and thus (i) improperly bundle all supply requirements, (ii) create organizational and personal conflicts of interest for the Prime Vendors, (iii) improperly outsource inherently governmental functions, and (iv) violate statutory law requiring competition and preference for contracting with veteran-owned small businesses is contrary to the public interest.

## PRAYER FOR RELIEF

WHEREFORE, the Plaintiffs requests that this Court:

i.      Enter judgment in favor of the Plaintiffs and against the United States;

ii.     Declare void any modifications to the Contracts that expand the scope beyond "distribution";

iii.    Issue a permanent injunction to prevent the VA from:

a. Making modifications to the PV contracts that would change them from "distribution" contracts to "distribution and supply" contracts and allow the PVs to assist in sourcing items (or reverse any such modifications that have been made already);

b. Adding items to the formulary based on PVs' sourcing assistance, rather than procurement procedures; or

c. Making any purchases of items placed on the formulary based on PVs' sourcing assistance, rather than procurement procedures; and

iv. Grant such further relief as the Court may deem just and proper.


Dated: June 27, 2018                                    HOLLAND & KNIGHT LLP


                                                       ____/s/ Eric S. Crusius___
                                                       Eric S. Crusius
                                                       1650 Tysons Boulevard
                                                       Suite 1700
                                                       Tysons, Virginia 22102
                                                       Phone: 703-720-8042
                                                       Fax: 703-720-8610
                                                       Email: eric.crusius@hklaw.com

                                                       *Counsel for Plaintiffs*

Of Counsel:

Gregory R. Hallmark
Holland & Knight LLP
1650 Tysons Boulevard
Suite 1700
Tysons, Virginia 22102
Phone: 703-720-8045
Fax: 703-720-8610
Email: gregory.hallmark@hklaw.com

Mary Beth Bosco
Holland & Knight LLP
800 17th Street N.W.
Suite 1100
Washington, DC 20006
Phone: 202-469-5270
Fax: 202-955-5564
Email: marybeth.bosco@hklaw.com

Elizabeth N. Jochum
Holland & Knight LLP
1650 Tysons Boulevard
Suite 1700
Tysons, Virginia 22102
Phone: 703-720-8606
Fax: 703-720-8610
Email: elizabeth.jochum@hklaw.com

Mitchell Bashur
Holland & Knight LLP
1650 Tysons Boulevard
Suite 1700
Tysons, Virginia 22102
Phone: 703-720-8023
Fax: 703-720-8610
Email: mitchell.bashur@hklaw.com